897 F.2d 626
 58 USLW 2518, Prod.Liab.Rep.(CCH)P 12,391
 In re JOINT EASTERN AND SOUTHERN DISTRICT NEW YORK ASBESTOS
LITIGATION.
Elvira GRISPO as Administratrix of the Estate of Joseph
Grispo Deceased and Elvira Grispo Individually, Appellees,
v.
EAGLE--PICHER INDUSTRIES, INC., Appellant.
Dominick FUSCO, Appellee,
v.
EAGLE-PICHER INDUSTRIES, INC., Appellant.
Charles Patrick HYNES, Appellee,
v.
EAGLE-PICHER INDUSTRIES, INC., Appellant.
Hyman STONE and Gussie Stone, Appellees,
v.
EAGLE-PICHER INDUSTRIES, INC., Appellant.
 Nos. 391-394, Dockets 89-7667, 89-7669, 89-7677 and 89-7679.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 25, 1989.
Decided Feb. 20, 1990.
 
 Joe G. Hollingsworth, Washington, D.C. (Paul G. Gaston, Spriggs & Hollingsworth, Washington, D.C., George F. Hritz, Davis, Markel & Edwards, New York City, of counsel), for appellant Eagle-Picher.
 Donald I. Marlin, New York City, for appellees Hynes and Grispo.
 Stanley J. Levy, New York City, for appellees Stone and Fusco.
 Before OAKES, Chief Judge and MINER and RUBIN,* Circuit Judges.
 OAKES, Chief Judge:
 
 
 1
 This case, an interlocutory appeal under 28 U.S.C. Sec. 1292(b) (Supp. V 1987), raises an issue of first impression in this Circuit and one of undoubtedly considerable importance to the many people now litigating claims against military contractors for injuries suffered due to asbestos exposure. In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court recognized a federal common law defense for military contractors which, in certain instances, displaces duties imposed pursuant to state tort law. In the proceedings below, the United States District Court for the Eastern District of New York, Charles P. Sifton, Judge, by an order dated June 27, 1989, denied the motion of appellant Eagle-Picher Industries, Inc. ("Eagle-Picher") for summary judgment based upon the "military contractor defense" and, in turn, granted summary judgment for appellees striking the defense. We accepted certification of the appeal and now consider whether Boyle bars a state law failure-to-warn action seeking recovery for injuries alleged to have occurred from exposure to asbestos-based cement used at the Brooklyn Navy Yard during World War II.[1]
 
 
 2
 Because we review this case following a grant of summary judgment against Eagle-Picher, we necessarily accept all allegations in the light most favorable to Eagle-Picher. Appellees ("the workers") are three persons, and the survivor of a fourth, who had worked at the Brooklyn Navy Yard around the time of World War II: Joseph Grispo and Dominick Fusco from 1941 to 1945, Charles Hynes from 1941 to 1946, and Hyman Stone from 1942 to 1944. The claims are that each of the workers was exposed during his respective time of employment to an asbestos-based cement, alternately referred to as "Eagle 66" or "Super 66," manufactured by Eagle-Picher and used on Navy ships under construction or repair at the Navy Yard.
 
 
 3
 As the record indicates in some detail, the Navy subjected the cement to fairly precise design and testing specifications, with the most important such specification mandating that the product contain a substantial concentration of asbestos, which Navy engineers deemed necessary to withstand temperatures in excess of 500 degrees Fahrenheit.
 
 
 4
 Along with its specifications regarding product content, the Navy also issued instructions pertaining to the product's packaging, packing, and labeling. A typical one of the relevant Navy guidelines instructed:
 
 
 5
 G-1. Packaging.--Unless otherwise specified, commercial packages are acceptable under this specification.
 
 
 6
 G-2. Packing.--Unless otherwise specified, the subject commodity shall be delivered in substantial commercial containers of the size commonly used, so constructed as to insure safe delivery by common or other carriers to the point of delivery at the lowest rate, and to withstand storage, rehandling, and reshipment without the necessity for further repackaging.
 
 
 7
 G-3. Shipping containers.--Unless otherwise specified, shipping containers shall be marked with the name of the material, the type, and the quantity contained therein, as defined by the contract or order under which the shipment is made, the name of the contractor, the number of the contract or order, and the gross weight.[2]
 
 
 8
 In the proceedings below, Eagle-Picher moved for summary judgment, arguing that the military contractor defense recognized in Boyle precluded recovery by the workers in this case. The workers all cross-moved for summary judgment striking the defense.
 
 
 9
 In ruling upon Eagle-Picher's summary judgment motion and the workers' cross-motions, the district court found that Eagle-Picher had not established a "significant conflict" within the meaning of Boyle between the applicable labeling requirements and any state law duties to warn which may exist in this case.[3] Accordingly, the district court denied Eagle-Picher's motion for summary judgment and granted the workers' motions for summary judgment striking the defense.
 
 
 10
 For the reasons discussed below, we affirm the district court's order insofar as it denies Eagle-Picher's motion for summary judgment, but vacate its order insofar as it grants the workers' motions striking the military contractor defense, and remand for further proceedings consistent with this opinion.
 
 
 11
 I. BOYLE V. UNITED TECHNOLOGIES CORP.
 
 
 12
 Prior to addressing the particular contentions at issue in this case, we consider it worthwhile to address briefly the Supreme Court's decision in Boyle.
 
 
 13
 In Boyle, a Marine helicopter co-pilot was drowned when his helicopter crashed off the coast of Virginia Beach and he was trapped inside by a defectively designed escape hatch. Because the escape hatch only opened outward, it could not open when submerged and subjected to water pressure. The co-pilot's father sued the helicopter's manufacturer under a Virginia state law design defect theory. Following a jury verdict in favor of the co-pilot's father, the Supreme Court granted certiorari to consider if and when federal law provided a defense for military contractors sued under state law.
 
 
 14
 The Court ruled federal law does provide such a defense, reasoning that the "uniquely federal" interest in regulating the liabilities of military contractors working for the Government warranted granting military contractors a federal common law defense displacing state law tort duties. But the Court limited the defense to when a state tort law duty poses a "significant conflict" with the duties imposed under a federal contract. See Boyle, 108 S.Ct. at 2515-16.
 
 
 15
 The Court found that the policies underlying the discretionary function exception to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. Sec. 2680(a) (1982), which reserves the Government's sovereign immunity for claims arising out of the Government's discretionary policy-making decisions, furnished the rationale for a military contractor defense in instances in which state tort law duties come into significant conflict with a contractor's obligations under a federal contract. The Court considered the Government's selection of design of military equipment a paradigmatic policy decision that the discretionary function exception shields from the type of judicial "second-guessing" which would come from the ordinary operation of state tort law. See Boyle, 108 S.Ct. at 2517-18 (citing United States v. Varig Airlines, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)). Without a congruent defense for military contractors acting pursuant to government design specifications, it reasoned, the discretionary function exception would lose much of its force. If faced with liability for carrying out the Government's directions, military contractors would pass the costs back to the Government through higher prices, thereby reimposing upon the Government the risks which stem from policy decision-making and thus frustrating the objective of the discretionary function exception of insulating the Government from those risks. See Boyle, 108 S.Ct. at 2518.
 
 
 16
 In outlining the scope of the military contractor defense, the Court prefaced its explanation by observing that the military contractor defense would not always displace state tort law, because state tort law does not inevitably conflict with duties imposed upon military contractors under federal contract. For instance, it noted, a federal contract for an air conditioner which specified cooling capacity but not design would not displace state law duties requiring a particular design, because such state duties, while adding to what the federal contract called for, would not be contrary to the federal contract. See id. at 2516. Similarly, the Court noted in Boyle, if the Government had ordered the helicopter in question from "stock," state law requiring that the escape hatch open inward would not be displaced. By ordering from stock, the Government would have signified its ambivalence as to the escape hatch's design and its tacit acceptance of whatever design state law might mandate. See id. By contrast, on the facts in Boyle, the Court observed, the duties imposed by the federal contract and state law did significantly conflict. The federal contract required that the escape hatch open outward; state law required that it open inward. In the Court's view, such a sharp conflict necessitated that federal law displace the state law design defect claim. See id.
 
 
 17
 Delineating the specific boundaries of the military contractor defense, the Court held that the defense displaces a state tort law design duty "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Id. at 2518 (citing McKay v. Rockwell Int'l Corp., 704 F.2d 444, 451 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984)). The first element ensures that the design specification at issue actually was considered by a government official--or, in other words, that a government official had made the type of policy decision considered a discretionary function under the FTCA. The second element ensures that the supplier actually acted upon the Government's discretion. The final element encourages the contractor to provide all information at its disposal to the government official and in so doing facilitates a fully informed decision by the government official.
 
 
 18
 II. APPLICATION OF BOYLE TO FAILURE-TO-WARN CLAIM
 
 
 19
 A. EAGLE-PICHER'S ARGUMENTS FOR SUMMARY JUDGMENT
 
 
 20
 Eagle-Picher's first series of arguments challenge the district court's denial of its motion asserting Boyle as grounds for summary judgment in its favor. Eagle-Picher's claim for summary judgment calls upon us to determine the general standards guiding a court in applying Boyle to a failure-to-warn claim.
 
 
 21
 Before we turn to the standard governing the application of Boyle to this case, we initially note that Boyle concerned federal displacement of a state law design defect action. In this case, by contrast, the workers have alleged failure to warn, a separate tort theory. This distinction, the workers claim, is enough to render Boyle inapplicable. We disagree. When a federal contract and state tort law give contrary messages as to the nature and content of required product warnings, they cause the sort of conflict Boyle found so detrimental to the federal interest in regulating the liabilities of military contractors. Just as with conflicting federal and state design requirements, the existence of conflicting federal and state warning requirements can undermine the Government's ability to control military procurement. Consequently, we follow the other federal courts which already have held that Boyle may apply to a state law failure-to-warn claim. See Garner v. Santoro, 865 F.2d 629, 635 (5th Cir.1989); Niemann v. McDonnell Douglas Corp., 721 F.Supp. 1019, 1024-25 (S.D.Ill.1989); Dorse v. Armstrong World Indus., 716 F.Supp. 589, 590 (S.D.Fla.1989); Nicholson v. United Technologies Corp., 697 F.Supp. 598, 604 (D.Conn.1988).
 
 
 22
 Having found that, in appropriate circumstances, Boyle may require displacement of such a duty, we next consider under what circumstances Boyle requires displacement of a state law duty to warn. We agree with the district court that for Eagle-Picher to establish that Boyle displaces any state law duty to warn, Eagle-Picher must show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law. Moreover, it seems clear to us that Boyle 's requirement of government approval of "reasonably precise specifications" mandates that the federal duties be imposed upon the contractor. The contractor must show that whatever warnings accompanied a product resulted from a determination of a government official, see Boyle, 108 S.Ct. at 2518 ("feature in question [must be] considered by a Government officer, and not merely by the contractor itself"), and thus that the Government itself "dictated" the content of the warnings meant to accompany the product. See Nicholson, 697 F.Supp. at 604. Put differently, under Boyle, for the military contractor defense to apply, government officials ultimately must remain the agents of decision.[4]
 
 
 23
 Eagle-Picher has resisted any reading of Boyle which would emphasize specific government imposition of a particular type of product warnings. Instead, it has offered five alternative approaches for applying Boyle to this case, all of which tend to lower the threshold of government involvement in shaping the nature and content of product warnings necessary to establish a military contractor defense. Not surprisingly, each approach suggested to us by Eagle-Picher would lead to our reversing the district court and granting summary judgment in Eagle-Picher's favor. Because all of these suggested approaches sidestep what to us is the most essential factor in deciding whether Boyle should bar a state law failure-to-warn claim, we find none of them persuasive. We discuss each contention in turn.
 
 
 24
 First, Eagle-Picher asserts that in this case the Navy issued "reasonably precise specifications" requiring that its product contain asbestos, thus requiring displacement of any state law duty to warn. Under Boyle, a federal contract provision directed by the Government will displace a parallel state law requirement. Accepting that the relevant Navy contract commanded an asbestos-based product, such a requirement would displace a contrary state law duty--i.e., one that required the product not contain asbestos. However, we do not see how a federal contract specification requiring a certain product design conflicts with state law requiring a certain set of warnings incident to use of that product or design. Here the Navy specification requiring that Eagle-Picher's cement product include asbestos does not conflict with a state law duty to warn and accordingly does not command its displacement.[5]
 
 
 25
 Second, even accepting that the Government's specifications did not touch upon the duty to warn, Eagle-Picher insists that, as a matter of law, reasonably precise government specification of product content should suffice to displace a state law duty to warn, because to impose liability upon a military contractor for failure to warn in instances when Boyle would bar a design defect action would render the military contractor defense a dead letter. In this vein, Eagle-Picher depicts the workers' state law failure-to-warn action as an "end run" around Boyle. We disagree. As the Boyle Court pointedly explained, "[C]onflict there must be." Boyle, 108 S.Ct. at 2516. To us, a plaintiff's ability to pursue a failure-to-warn claim when Boyle may foreclose a design defect claim is not indicative of some loophole inadvertently left open by Boyle, but rather demonstrates a crucial lack of the necessary conflict between state and federal warning requirements. Indeed, it is not unreasonable to imagine that, as in this case, government contracts often may focus upon product content and design while leaving other safety-related decisions, such as the method of product manufacture or the nature of product warnings, to the contractor's sole discretion. In these instances, state law design requirements are displaced, although state law warning requirements are not. See Garner v. Santoro, 865 F.2d 629, 635-36 (5th Cir.1989) (observing "the difficulty that a defendant will have under Boyle in establishing an identifiable federal interest or policy in the existence or methods of warning and a significant conflict between that federal interest or policy and the operation of state law"). In a failure-to-warn action, where no conflict exists between requirements imposed under a federal contract and a state law duty to warn, regardless of any conflict which may exist between the contract and state law design requirements, Boyle commands that we defer to the operation of state law.
 
 
 26
 Third, Eagle-Picher offers still another reason why we should bar a failure-to-warn claim in instances where Boyle would preclude a design defect claim. Permitting the failure-to-warn claim in these instances, Eagle-Picher urges, would result in the imposition of pass-through costs from the contractor upon the Government. Although the desire to limit pass-through costs motivated the Court's decision in Boyle, see Boyle, 108 S.Ct. at 2518, it is not the dispositive consideration. Had Boyle 's aim been to prevent military contractors from passing any liability costs on to the Government, it simply could have granted military contractors a blanket immunity from all state tort liability. After all, any potential risk faced by a military contractor inevitably will be reflected in the price it charges the Government. Boyle, however, rejected a construction of the military contractor defense based upon the Feres doctrine, see Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), which would have immunized a military contractor whenever a good it supplied injures an armed services member in the course of military service, in part because such a rule would cast a military contractor's immunity too broadly. See Boyle, 108 S.Ct. at 2517. As we have stressed above, Boyle hinges the military contractor defense upon the military contractor's having followed a government-approved requirement contrary to a state tort law duty, a condition far more precise than Eagle-Picher's broad and amorphous concern for avoiding the liability costs military contractors may derivatively impose upon the Government.
 
 
 27
 Fourth, Eagle-Picher notes that Boyle derived the military contractor defense from the discretionary function exception to the FTCA. According to Eagle-Picher, the record indicates that the Government made a conscious decision not to warn those working in shipyards during World War II of the dangers they faced from coming into contact with asbestos. This decision not to warn workers, Eagle-Picher submits, was a discretionary decision protected from suit by the discretionary function exception. See Robinson v. United States, 891 F.2d 31 at 36-38 (2d Cir.1989); see also Myslakowski v. United States, 806 F.2d 94, 97-99 (6th Cir.1986) (Government's failure to warn purchaser of surplus Jeep of Jeep's tendency to roll over protected by discretionary function exception), cert. denied, Y480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987); Ford v. American Motors Corp., 770 F.2d 465 (5th Cir.1985) (same). But cf. Dube v. Pittsburgh Corning, 870 F.2d 790, 796-800 (1st Cir.1989) (Government's failure to warn of hazards resulting from exposure to asbestos not protected by discretionary function exception when Government never made affirmative decision whether to warn). Contending that the Government would have had immunity under the discretionary function exception if sued by the workers in this case, Eagle-Picher concludes that it, too, should be immune.
 
 
 28
 Eagle-Picher, however, omits a crucial distinction between the discretionary function exception and the military contractor defense. Stripped to its essentials, the military contractor's defense under Boyle is to claim, "The Government made me do it." Boyle displaces state law only when the Government, making a discretionary, safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion. Accepted as true, Eagle-Picher's allegations prove only that the Government made a discretionary decision not to warn those working with asbestos at our nation's shipyards during World War II of the hazards of asbestos. These allegations do not at all indicate that the Government controlled or limited the ability of contractors like Eagle-Picher themselves to warn those who would come into contact with its product.
 
 
 29
 Fifth and finally, Eagle-Picher insists that the third element of the Boyle test--requiring the supplier to warn the Government about any dangers in the use of the equipment that were known to the supplier but not to the Government, see Boyle, 108 S.Ct. at 2518--implies a preemption of any state law duty Eagle-Picher may have had to warn third parties coming in contact with the equipment. As we noted above, the requirement that a contractor inform the Government of the dangers attending to the equipment it proposes to supply is geared to ensure that the Government makes its decision to contract for that particular equipment with benefit of full knowledge of all hazards. By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety. Apart from their common use of the word "warn," the two duties bear absolutely no similarity to one another. Consequently, we reject the argument that the third element of the Boyle test preempts state law duties to warn.
 
 
 30
 B. EAGLE-PICHER'S ARGUMENTS AGAINST THE WORKERS' CROSS-MOTIONS FOR SUMMARY JUDGMENT
 
 
 31
 Eagle-Picher's next series of arguments asserts that even if the standard we explain for measuring a failure-to-warn claim against Boyle is correct and warrants denial of its motion for summary judgment, the district court erred in granting the workers' cross-motions for summary judgment striking the military contractor defense. Given the standard outlined above and this case's present posture at the summary judgment stage, for us to affirm the district court, the workers must demonstrate the absence of any genuine issue of material fact indicating that the Government may have dictated or otherwise controlled the nature and the content of the product warnings.
 
 
 32
 Eagle-Picher identifies three items from the record it claims establish such a genuine issue of material fact. First, it points to a document suggesting that the Navy withheld from shipyard workers information pertaining to the dangers from asbestos exposure because it feared dissemination of such information would trigger lawsuits and spark labor strife. This allegation, accepted as true, raises not the slightest hint that the Government in turn prohibited Eagle-Picher from issuing warnings on its own.
 
 
 33
 Second, Eagle-Picher points to a document indicating that manufacturers of asbestos-based products stated to the Navy that they were willing to issue precautions but that the Navy had resolved, "[W]e do not believe any specification changes are needed." If true, this information could establish that the manufacturers were willing to issue warnings if the Government so directed. Yet although such information, as the district court so aptly put it, may provide a foundation for concluding a conspiracy of silence may have existed between the Navy and the manufacturers, it does not suggest at all that the Government stood in the way of the manufacturers' issuing warnings on their own.
 
 
 34
 Finally, Eagle-Picher contends that the relevant packaging, packing, and labeling specification for its asbestos-based cement, quoted above, precluded it from furnishing product warnings. Eagle-Picher admits that this specification says nothing at all pertaining to warnings. Nonetheless, it urges that this specification, which created a very minimal floor for the information Eagle-Picher had to provide along with its product, in fact also created a ceiling, permitting no inclusion of any information by the manufacturer. We are not persuaded. Just as nothing in the relevant specification discusses product warnings, nothing in the specification purports to place a limit upon any additional information a manufacturer may have wished to convey to those using the product.
 
 
 35
 Nicholson v. United Technologies Corp., 697 F.Supp. 598 (D.Conn.1988), is not to the contrary. In Nicholson, the plaintiff, who was injured while repairing the landing gear of a military helicopter, alleged that the manufacturer had failed to provide adequate warnings and instructions for the repair of the landing gear. Because the information brought forth by discovery conclusively established that the Government had exercised extensive control over both the original compilation of the landing gear's repair manual and the revisions, the court found sufficient, specific governmental control over the content of the warnings to satisfy the "reasonably precise specifications" element of Boyle. See id. at 604. The scope of governmental control over the content of the repair manual in Nicholson supported the conclusion that the Government's specifications left no room for any addition by the manufacturer. The extent of governmental involvement in controlling product warnings in this case pales in comparison. Unlike Nicholson, the labeling instructions issued by the Government in this case were so few, so minor, and so generic, it would require a long leap of logic to conclude that they removed any ability of Eagle-Picher to augment the labeling. Accordingly, we do not find Nicholson analogous to this case.
 
 
 36
 Even though we are not impressed by Eagle-Picher's arguments opposing summary judgment for the workers, we still feel compelled to vacate summary judgment and remand to the district court for reconsideration. Upon our examination of the record, we have come across a number of variations of the packaging, packing, and labeling specification we quoted above in our discussion of facts. These specifications, as well as the Navy Shipment Marking Handbook Secs. 105-06 (3d ed. Mar. 1945), which also is in the record, all appear to touch upon the Government's labeling requirements for Eagle-Picher's product. We are not certain that the district court addressed all of this material in examining the initial summary judgment motions. Moreover, the district court did not establish the content of the earlier editions of the Navy Shipment Marking Handbook. Accordingly, we consider it preferable to remand to the district court to ensure that this material is evaluated and thereby to determine whether any genuine issues of material fact are raised. Cf. 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure Sec. 2728, at 191 (2d ed.1983) (noting the advisability of refraining from granting summary judgment when the factual record is unclear). If the district court finds that these materials establish a genuine issue of material fact pertaining to the Government's control over the product warnings accompanying Eagle-Picher's product, as well as finding a genuine issue of material fact for each of the remaining two elements of the Boyle standard, it becomes the jury's task to determine whether the military contractor defense applies in this case.[6] If upon reconsideration the district court finds an absence of any genuine issue of material fact, it may enter summary judgment against Eagle-Picher.[7]
 
 
 37
 III. OTHER ISSUES: THE AGENT ORANGE DECISION AND THE NEW YORK STATE LAW MILITARY CONTRACTOR DEFENSE
 
 
 38
 Although Eagle-Picher's argument for the most part has revolved around Boyle, its appeal raises certain other issues which we believe merit discussion. The first concerns the bearing upon this case of this Circuit's decision in In re "Agent Orange" Product Liability Litigation, 818 F.2d 187 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), a pre-Boyle opinion adopting the military contractor defense. The second involves whether New York state law, see supra note 1, recognizes a military contractor defense that would impose more stringent limits than Boyle upon the workers' prosecution of this action.
 
 A. AGENT ORANGE
 
 39
 We recognize that our holding today might appear to be in some tension with our earlier decision in Agent Orange. Of course, the Agent Orange case was a massive and widely publicized class action brought by persons claiming injuries from exposure to Agent Orange, a defoliant used by the military during the Vietnam War. One of the many claims lodged against the defendant chemical companies was that they had failed to provide sufficient warnings of the dangers of coming into contact with Agent Orange. The class eventually settled with the defendant chemical companies, see In re "Agent Orange" Prod. Liab. Litig., 597 F.Supp. 740 (E.D.N.Y.1984), aff'd, 818 F.2d 145 (2d Cir.1987), cert. denied, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); however, individual members opted out of the settlement and continued to prosecute their claims. Although the Government had established certain product specifications for Agent Orange, see In re "Agent Orange" Prod. Liab. Litig., 565 F.Supp. 1263, 1274 (E.D.N.Y.1983), as in this case, the specifications for Agent Orange did not call for any precautions or warnings about the dangers attending Agent Orange. See Agent Orange, 597 F.Supp. at 818. Notwithstanding that the government specifications were silent as to warnings, we held that the opt-out plaintiffs' claims against the chemical companies were barred by the military contractor defense.
 
 
 40
 Were it not for the Supreme Court's subsequent explanation of the military contractor defense in Boyle, our holding in Agent Orange might support Eagle-Picher's argument for summary judgment. However, the scope of our holding in Agent Orange has been trimmed by Boyle such that Agent Orange no longer carries the weight Eagle-Picher places upon it. Agent Orange grounded the military contractor defense upon broad separation-of-powers concerns counseling the insulation of military decisionmaking from judicial oversight. See Agent Orange, 818 F.2d at 190-91. Although these concerns certainly animated the Supreme Court's opinion in Boyle, see Boyle, 108 S.Ct. at 2517-18 (discussing need to prevent judicial "second-guessing" of selection of design of military equipment), Boyle ultimately cast the military contractor defense upon narrower grounds than we did in Agent Orange. In particular, Boyle predicated the military contractor defense upon the existence of a "significant conflict" between federal contracting requirements and state tort duties. For the conflict to be "significant," the Government must control product content by approving "reasonably precise specifications." See id. at 2518. Agent Orange neither honed in upon the need for a "significant conflict" nor required that government specifications be "reasonably precise." See Agent Orange, 818 F.2d at 192 (first element of military contractor defense established upon showing "[t]hat the government established the specifications for Agent Orange").[8] We think these differences underscore the more exacting standard a military contractor must satisfy after Boyle to establish the military contractor defense and thus limit the value of the facts of Agent Orange as a benchmark in a failure-to-warn action for satisfaction of the military contractor defense after Boyle. Consequently, we cannot accept Eagle-Picher's argument that Agent Orange governs this case.
 
 
 41
 B. NEW YORK STATE LAW MILITARY CONTRACTOR DEFENSE
 
 
 42
 Eagle-Picher's final claim is that even if neither Boyle nor Agent Orange bars this action, New York state law recognizes a military contractor defense which does. As an initial matter, we note that the district court's order neither discussed this issue nor identified it as controlling when he certified his order for interlocutory appeal. Nonetheless, strong reasons exist for resolving it at this time. This issue is closely related to the issues already presented by this appeal. Moreover, resolution of this issue will aid in the efficient resolution of this complex and difficult case, as well as the many other similar cases in which this issue may play a role. Because we may consider issues outside of the precise ones identified as controlling in the ruling certifying an order for interlocutory appeal, see Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 994 (2d Cir.), cert. denied, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); C. Wright, The Law of Federal Courts 715 (4th ed. 1983), and find this one worth undertaking at this time, we proceed to consider it.
 
 
 43
 As the military contractor defense exists to promote a federal interest in military procurement, see Sanner v. Ford Motor Co., 144 N.J.Super. 1, 9, 364 A.2d 43, 47 (Super.Ct. Law Div.1976), aff'd, 154 N.J.Super. 407, 381 A.2d 805 (Super.Ct.App.Div.1977) (per curiam), certification denied, 75 N.J. 616, 384 A.2d 846 (1978), we have difficulty accepting Eagle-Picher's supposition that a state might see fit to go above and beyond the protection provided for that interest by the highest federal court, where no conceivable state interest is implicated. Contrary to Eagle-Picher, we find no indication a New York state court would do so and accordingly reject Eagle-Picher's argument.
 
 
 44
 Here Eagle-Picher asks us to interpret an unresolved matter of New York state law. When a federal court applies state law, it looks to the ruling of the state's highest court. However, when the state's highest court has not spoken to the state law issue presented to the federal court, the federal court then must apply the law as it believes the state's highest court would, giving " 'proper regard' to relevant rulings of other courts of the State." See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).
 
 
 45
 The New York Court of Appeals has not considered whether New York law recognizes a military contractor defense. Although two cases from the New York Supreme Court do discuss this doctrine, they do not furnish us with much guidance.
 
 
 46
 In Casabianca v. Casabianca, 104 Misc.2d 348, 428 N.Y.S.2d 400 (Sup.Ct.1980), the New York Supreme Court for Bronx County barred a design defect action brought against the manufacturer of a pizza dough machine made for the Army during World War II. Without much discussion, the court held that a supplier of goods to the military during time of war who complies with government specifications has "a complete defense to any action based upon design." See id. at 350, 428 N.Y.S.2d at 402. More recently, in In re New York City Asbestos Litigation, 144 Misc.2d 42, 542 N.Y.S.2d 118 (Sup.Ct.1989), the New York Supreme Court for New York County held that Casabianca did not bar an action almost identical to the one presented in this case, a failure-to-warn action brought by widows of Brooklyn Navy Yard workers for injuries suffered from the deaths of their husbands due to exposure to Eagle-Picher's asbestos-containing products. The court looked to New York's toxic tort revival statute, 1986 N.Y. Laws ch. 682, Sec. 4, which was enacted after Casabianca and which extended the limitations period for persons injured by asbestos, and found a general legislative disposition favoring compensation of victims of asbestos exposure. This aim, the court reasoned, would be frustrated if Casabianca were to apply to cases involving asbestos. See id. 144 Misc.2d at 46-47, 542 N.Y.S.2d at 121.
 
 
 47
 We do not consider it necessary to predict whether the New York Court of Appeals would follow Casabianca and, if so, how it would resolve the conflict between it and In re New York City Asbestos Litigation in order to conclude that the New York Court of Appeals would not recognize a military contractor defense barring this action. A military contractor defense based on state law would rest upon the same general rationale supporting the federal common law defense. As explained by the New Jersey Superior Court in its adoption of the military contractor defense in Sanner:
 
 
 48
 To impose liability on a governmental contractor who strictly complies with the plans and specifications provided to it by the Army in a situation such as this would seriously impair the government[']s ability to formulate policy and make judgments pursuant to its war powers.
 
 
 49
 Sanner, 144 N.J.Super. at 9, 364 A.2d at 47. To the extent one can glean a motivating principle from Casabianca, it is the same idea driving Sanner--deference to federal military decision-making. See Casabianca, 104 Misc.2d at 350, 428 N.Y.S.2d at 402.
 
 
 50
 Because the federal common law military contractor defense shares the same justification with state law military contractor defenses set forth in Sanner and Casabianca, we see no reason to believe that if the New York Court of Appeals were to recognize a state law military contractor defense, it would construe it more broadly than the standard enunciated in Boyle. Because, as we have explained above, Boyle does not support granting summary judgment to Eagle-Picher on the military contractor defense, whatever New York state military contractor defense that might exist would not either.CONCLUSION
 
 
 51
 To summarize, we affirm the district court's ruling denying Eagle-Picher's motion for summary judgment on the military contractor defense. We vacate its ruling granting the workers' motions for summary judgment striking the defense. We remand to the district court for reconsideration whether the various Navy packaging, packing, and labeling requirements appearing in the record or the various editions of the Navy Shipment Marking Handbook establish a genuine issue of material fact that the Government might have precluded Eagle-Picher from including any product warnings with the goods alleged to have injured the workers.
 
 
 52
 So ordered.
 
 MINER, Circuit Judge, concurring:
 
 53
 I concur in the result but perceive only one factual issue remaining for determination on remand--whether Eagle-Picher warned the United States of dangers known to it but not known to the Government. I respectfully disagree with the proposition, advanced by the district court and endorsed by the majority, that it is incumbent upon Eagle-Picher in this case to "show that the applicable federal contract includes warning requirements that significantly conflict with those that might be imposed by state law," ante at 620, in order to prevail on its Government contractor defense. Moreover, I see no purpose in directing the district court on remand to evaluate the Navy Shipment Marking Handbooks and other evidence to determine if there is a factual issue as to whether "the Government might have precluded Eagle-Picher from including any product warnings with the goods alleged to have injured the workers," ante at 637. Whether the Government prevented the asbestos manufacturers from including a warning with asbestos product shipments is an irrelevant inquiry in this case, since it is apparent from the record in its present state that Eagle-Picher was shielded by the Government contractor defense from any state law duty to warn the shipyard employees, provided it had warned the Government of known hazards.
 
 
 54
 It is common ground that a successful contractor defense must meet the standards established in Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), a products liability case involving a claim of defect in the design of a Marine Corps helicopter escape hatch. Boyle teaches that the operation of state law is displaced whenever it conflicts significantly with an identifiable federal policy or interest. Id. 487 U.S. at 507-08, 108 S.Ct. at 2515-16, 101 L.Ed.2d at 454-55. Displacement of state law is not dependent only upon a finding of significant conflict between "federal contracting requirements and state tort duties," ante at 635 (emphasis added), as the majority would have it. Here, as in Boyle, there is a strong federal interest in the supply of military products and equipment to the armed forces through contractors who will not refuse to bid for fear of lawsuits or will not pass higher liability insurance premiums on to the Government in the form of increased prices. Here, as in Boyle, that clearly identifiable interest clashes in a significant way with the operation of state law governing liability for dangerous products.
 
 
 55
 In an effort to distance the case at bar from Boyle, the majority notes a "contrast" between the design defect theory put forward by the plaintiff in Boyle and the "alleged failure to warn, a separate tort theory," ante at 629, put forward by the plaintiffs here. The distinction is hardly so sharp as to be called a "contrast," however. Defects in product manufacturing and design and failure to warn of product hazards are all of a piece under the general rubric of strict products liability. See generally W. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on Torts Sec. 99, at 695-98 (5th ed. 1984). The plaintiffs' claims concededly are governed by New York law where federal law does not apply and, "[a]lthough failure to warn sounds in negligence, New York courts have also held that inadequate warnings will render a product defective for purposes of warranty and strict products liability." Ezagui v. Dow Chemical Corp., 598 F.2d 727, 733 (2d Cir.1979) (failure to provide adequate warning established prima facie case of product defect). The New York rule is that, "[r]egardless of the descriptive terminology used to denominate the cause of action (viz. 'strict liability' or 'negligence'), where the theory of liability is failure to warn, negligence and strict liability are equivalent." Wolfgruber v. Upjohn Co., 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), aff'd mem., 52 N.Y.2d 768, 417 N.E.2d 1002, 436 N.Y.S.2d 614 (1980); see also Alfieri v. Cabot Corp., 17 A.D.2d 455, 460, 235 N.Y.S.2d 753, 759 (1st Dep't 1962), aff'd mem., 13 N.Y.2d 1027, 195 N.E.2d 310, 245 N.Y.S.2d 600 (1963). If New York law is to be applied, disparate theories of liability cannot be relied upon to distinguish the claims asserted by plaintiffs here from the claims asserted in Boyle.
 
 
 56
 Since there is a significant conflict between state law and federal policy, and since failure to warn may be equated with design defects as the theory of recovery in this case, there remains for analysis only the conditions enumerated in the Supreme Court's formulation of the Government contractor defense:
 
 
 57
 Liability for ... defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.
 
 
 58
 Boyle, 108 S.Ct. at 2518.
 
 
 59
 It seems to me that the first two conditions clearly have been met here: the Government approved reasonably precise specifications for insulation cement, including the asbestos component, and the parties do not dispute that the material furnished conformed to specifications. The Government also specified the contents of the asbestos package label. If a warning were desired, it would have been prescribed. The decision to omit any warning was an exercise of the type of discretion protected by the discretionary function exception to the Federal Tort Claims Act, an exception which applies where the government either exercises or fails to exercise a discretionary function. 28 U.S.C. Sec. 2680(a) (1982); Myslakowski v. United States, 806 F.2d 94 (6th Cir.1986), cert. denied, 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 793 (1987); see Robinson v. United States, 891 F.2d 31, 36-38 (2d Cir.1989). The only warning required was a warning to the Government of dangers known to the supplier but not to the Government, in compliance with the third prong of the Boyle test. In any event, the Government contractor defense would be set at naught if the failure to attach a warning label to a product could be asserted as the predicate for a products liability claim that otherwise would be barred. See Nicholson v. United Technologies Corp., 697 F.Supp. 598, 603 (D.Conn.1988); see also In re "Agent Orange" Product Liability Litigation, 818 F.2d 187 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988).[1]
 
 
 60
 Also capable of rejection on the present state of the record is the contention by plaintiffs that the injurious asbestos-based cement was a "stock" item similar to the hypothetical "stock" helicopter referred to in Boyle as not subject to the contractor defense. Boyle, 108 S.Ct. at 2516. Here, the cement product was manufactured as specified by the Government, although stock items may have been used as components. Agent Orange itself was composed of stock items, but the Government prescription of how those items should be combined and packaged was the key to the military contractor defense asserted by the manufacturer of that toxic chemical. See Agent Orange, 818 F.2d at 191. Neither is there any basis in the record for plaintiffs' contention that performance specifications are at issue here. The specifications for insulation cement, whether developed by Eagle-Picher or the Government or both in tandem, are content-specific and bear no relationship to the performance standards of a product such as an air conditioning unit ordered by "specifying the cooling capacity but not the precise manner of construction," Boyle, 108 S.Ct. at 2516.
 
 
 61
 I agree with the plaintiffs, the district court and the majority that the third prong of the Boyle test, the warning by the supplier of dangers known to the supplier but not to the Government, calls forth a factual issue to be resolved by trial in this case. There is evidence that as early as 1932 Eagle-Picher was aware of the hazards of asbestos. In that year, it received a report from the United States Bureau of Mines regarding asbestos at its Rock Wool Plant in Joplin, Missouri. The report noted that asbestos was one of the most dangerous dusts to which a person could be exposed. As a member of the Industrial Hygiene Foundation, Eagle-Picher in 1941 received a number of reports summarizing articles concluding that exposure to asbestos dust for as little as one year caused asbestosis and pulmonary cancer in some workers. There is evidence that, for many years, the Government also knew of potential hazards associated with asbestos. A 1937 report of the Association of Military Surgeons of the United States indicated that pulmonary fibrosis was a potential risk of asbestos exposure. In 1940, the Senior Medical Officer of the Brooklyn Naval Shipyard reported that asbestos was one of the primary health hazards among insulation workers at Naval shipyards. In 1941, Navy officials acknowledged that "we are not protecting the men as we should" from uncontrolled exposure to asbestos dust.
 
 
 62
 It is apparent from the foregoing that there is abundant evidence that both Eagle-Picher and the Government had knowledge of the dangers of asbestos. The true extent of that knowledge, when it was acquired, and when it was communicated, should be resolved at trial in order to answer the third question posed in Boyle. I concur only to the extent that remand is ordered on this issue.
 
 
 
 *
 Of the United States Court of Appeals for the Fifth Circuit, sitting by designation
 
 
 [1]
 Both sides represent that this diversity action is governed by New York law where federal law otherwise would not apply. For purposes of this opinion only, we proceed upon this assumption accordingly
 Additionally, we note that this appeal does not raise the question whether New York law imposes a duty to warn under these facts, or whether a failure to warn was the proximate cause of the workers' alleged injuries. Consequently, nothing in our decision today should be read as expressing an opinion on either issue.
 
 
 [2]
 The record suggests that during World War II and the decade or so preceding it, the Navy employed several variations of this packaging, packing, and labeling specification. During oral argument, counsel for Eagle-Picher indicated that the specification we quote in the text was used in this case. However, as we discuss below, the extent to which the other variations of this packaging, packing, and labeling specification may be relevant in this litigation is unclear
 
 
 [3]
 The United States District Court for the Southern District of Florida likewise has held Boyle inapplicable in a case involving similar facts. See Dorse v. Armstrong World Indus., 716 F.Supp. 589 (S.D.Fla.1989)
 
 
 [4]
 Of course, if a contractor were to establish government control over the nature of product warnings, to satisfy Boyle, it then would have to demonstrate both its compliance with the Government's directions and its communication to the Government of all product dangers known to it but not to the Government. See Boyle, 108 S.Ct. at 2518
 
 
 [5]
 We note our ruling here that a military contractor sued on a failure-to-warn theory may not establish the military contractor defense under Boyle simply by establishing compliance with reasonably precise design specifications may appear facially at odds with rulings of two other federal courts. Smith v. Xerox Corp., 866 F.2d 135, 136-38 (5th Cir.1989), held that proof of government approval of design specifications for a weapon simulator was a defense to a state law failure-to-warn action. Likewise, Niemann v. McDonnell Douglas Corp., 721 F.Supp. 1019, 1025-27 (S.D.Ill.1989), held that Air Force specifications requiring inclusion of asbestos-containing parts were a defense to a state law failure-to-warn action
 But in neither case is it clear that the parties ever raised the question whether under Boyle a military contractor must show that the Government prescribed the content of product warnings in order to displace a failure-to-warn action. Indeed, neither opinion addresses this question. Accordingly, we cannot assume that either court passed upon the position we take today.
 
 
 [6]
 The district court held the workers had demonstrated genuine issues of material fact concerning the third element of Boyle test, whether Eagle-Picher warned the Government of hazards known to Eagle-Picher but not known by the Government, which would preclude summary judgment in favor of Eagle-Picher, even if Eagle-Picher were to have established the first two elements of Boyle. We agree with the district court on this point
 The district court asserted the lack of a significant conflict as grounds for granting the workers' cross-motions for summary judgment striking the defense. Accordingly, it did not discuss whether genuine issues of material fact as to the third Boyle element would have foreclosed granting the workers summary judgment for Eagle-Picher's failure to disclose known hazards to the Government. We express no opinion on this issue. Similarly, neither the district court nor the parties have addressed Eagle-Picher's compliance with the government specifications in this case. We likewise express no opinion on this issue.
 
 
 [7]
 The workers advance two arguments, not addressed by the district court below, which they assert provide alternate grounds to support the district court's entry of summary judgment in their favor. First, they depict the asbestos-based cement supplied by Eagle-Picher as an off-the-shelf, "stock" item, analogous to the hypothetical stock helicopter the Boyle Court observed would fall outside the military contractor defense. See Boyle, 108 S.Ct. at 2516. The record is not sufficiently clear on this point to permit summary judgment. Second, in a somewhat related contention, the workers characterize Eagle-Picher's product as an ordinary consumer good and then argue that the military contractor defense is limited to strictly "military equipment." Even if we were to accept this interpretation of Boyle, the factual record on this issue is similarly unclear so as to preclude summary judgment
 
 
 [8]
 The district court holding first setting forth the military contractor defense, see In re "Agent Orange" Prod. Liab. Litig., 534 F.Supp. 1046, 1053-58 (E.D.N.Y.1982), and later endorsed in large part by our court's Agent Orange decision, see 818 F.2d 187, 192 (2d Cir.1987), cert. denied, 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988), also cast the military contractor defense in terms broader than Boyle. In particular, although noting it would be more difficult to establish the military contractor defense when the Government issued only performance specifications, without issuing design specifications, the district court nonetheless accepted that the defense could rest solely upon government establishment of performance specifications. See id. at 1056. Boyle, on the other hand, suggested that performance specifications alone could not furnish a sufficient foundation for the military contractor defense. See Boyle, 108 S.Ct. at 2516 (observing that state law design duties would not be displaced by Government's order placed for air conditioner which specifies performance capability but not design)
 
 
 [1]
 I do not accept the majority's view that the scope of our holding in Agent Orange has been "trimmed" by Boyle. The Supreme Court's analysis of the military contractor defense in Boyle does not differ in any meaningful way from our earlier analysis of the defense in Agent Orange. The defense was bottomed on separation of powers concerns in both cases. The specifications in Agent Orange did not call for warnings, and we there applied the military contractor defense to bar the failure to warn claims of the opt-out plaintiffs