[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12308
_____

D. C. Docket No. 07-00113-CV-WLS-7

JULIE W. BRINSON,
Individually as Surviving Spouse of
Judson Byron Brinson, Deceased,

JULIE W. BRINSON,
Executrix and Personal Representative of
the Estate of Judson Byron Brinson, Deceased,

                                                    Plaintiff-Appellant,

versus

RAYTHEON COMPANY,
a Delaware corporation doing business in Georgia,
et al.,

                                                    Defendants,

RAYTHEON AIRCRAFT COMPANY,
a Kansas corporation doing business in Georgia,

                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 24, 2009)

Before TJOFLAT, ANDERSON and STAPLETON,[*] Circuit Judges.

ANDERSON, Circuit Judge:

Plaintiff-Appellant Julie W. Brinson appeals the district court's order granting summary judgment in favor of Defendant-Appellee Raytheon Aircraft Company n/k/a Hawker Beechcraft Corporation ("RAC"). The district court concluded that RAC was shielded from state law tort liability by application of the military contractor defense. For the reasons set forth below, we affirm.

## I. FACTS

On April 3, 2004, Judson B. Brinson, a Captain in the United States Air Force ("USAF") Reserves, died when the aircraft he was co-piloting, the T-6A Texan II ("T-6A"), crashed near Savannah, Georgia. Appellant asserts that the T-6A was defectively designed by RAC.

Brinson was an instructor in the Joint Primary Aircraft Training System program ("JPATS"). JPATS was established to develop a unified system to train flight personnel from all branches of the military. In 1992, JPATS issued a request for design proposals for a new aircraft suitable for training military personnel to fly

---

[*] Honorable Walter K. Stapleton, United States Circuit Judge for the Third Circuit, sitting by designation.

jets.  Although several competitors submitted designs for jet aircraft, RAC's prototype was a standard single-propeller aircraft called the Pilatus PC9.  Propeller driven aircraft have the attraction of being less expensive than jet aircraft.

However, there are key differences between single-propeller and jet aircraft – among them the P Factor.  The P Factor is a natural aerodynamic property of single propeller-driven planes, which causes the aircraft to yaw and roll to the left.  Normally, pilots of propeller driven aircraft manually adjust the plane's rudder to compensate for the P Factor.  However, jet aircraft are unaffected by the P Factor.  Therefore, in order to make its prototype emulate a jet, RAC designed and developed a trim aid device ("TAD").  The TAD uses a computer and data input sensors to automatically adjust the plane's rudder through a series of pushrods and bell cranks.

Plaintiff argues that the T-6A was defectively designed in two ways.  First, Plaintiff argues that the various components of the trim system represent "single point failure opportunities" – when one component of the system breaks, the entire TAD system fails.  Plaintiff alleges that RAC should have included redundancies in the rudder trim system to prevent the failure of the entire system in the event of a single point failure.  Second, Plaintiff alleges that the rudder trim system was defectively designed using Teflon-lined pushrods.  RAC selected the Teflon-lined

3

rods because they are self-lubricating and require less maintenance. However, according to Plaintiff, Teflon tightens up with use and exposure to humidity. The tighter the bearing on the end of the pushrod, the higher the bending stress and the greater likelihood a rod will fracture and fail.

Plaintiff's theory of the crash is as follows. Due to the heightened bending stress caused by the use of Teflon-lined end bearings on the pushrods, one of the pushrods fractured during takeoff – when the P factor is most pronounced. This caused the entire TAD system to suddenly and unexpectedly fail. It sent the aircraft into a severe, uncommanded left roll, causing the aircraft to crash.

Resolution of RAC's motion for summary judgment requires an in-depth examination of the process by which RAC and the USAF worked together to produce the T-6A. The relevant evidence in this case is undisputed.[1] However, its significance is hotly contested. We will analyze the critical facts in the following section. To set the stage, we note that the TAD was initially designed and patented without any input from the government. However, military representatives and RAC employees worked closely together during the development of all aspects of

---

[1]    Brinson did not expressly refute the numbered facts in RAC's motion for summary judgment. As a result, the district court deemed admitted RAC's statement of material facts. Brinson does not challenge that finding on appeal or assert that any of those factual allegations are false. Accordingly, we accept RAC's undisputed statement of material facts as true.

the aircraft. The military was also involved in testing and certification of the T-6A. Furthermore, in January of 2004, four months before the accident at issue, the USAF issued a Technical Compliance/Technical Order ("TCTO") requiring inspection and replacement of the T-6A's rudder trim pushrods. The TCTO ordered that the rods be replaced by new, but otherwise identical, Teflon-lined rods. The aircraft piloted by Captain Brinson on April 3, 2004 had been subjected to the remedy ordered by the TCTO; its rods had been replaced. In 2006, well after the accident at issue, the military ordered that the Teflon-lined rod ends be replaced with a greased metal alternative.

RAC filed a motion for summary judgment asserting that it was shielded from liability by application of the military contractor defense. The district court agreed and entered summary judgment in favor of RAC. Brinson filed the instant appeal.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. Holloman v. Mail-Well Corp., 443 F.3d 1199, 1204 (11th Cir. 2006). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

5

"When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986).

## III.  DISCUSSION

"[A] few areas, involving 'uniquely federal interests,' are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts." Boyle v. United Tech. Corp., 487 U.S. 500, 504, 108 S. Ct. 2510, 2514 (1988) (internal citation omitted). "[T]he procurement of equipment by the United States is an area of uniquely federal interest . . . ." Boyle, 487 U.S. at 505-07, 108 S. Ct. at 2515-16. This, however,

> merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where . . . a "significant conflict" exists between an identifiable federal policy or interest and the operation of state law, or the application of state law would frustrate specific objectives of federal legislation.

Boyle, 487 U.S. at 507, 108 S. Ct. at 2516 (internal quotations and citations omitted).

6

The "scope of displacement" is determined by a three-part test.  Boyle, 487

U.S. at 512, 108 S. Ct. at 2518.

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Id.  This doctrine is referred to as the "military contractor defense."  See Gray v.

Lockheed Aeronautical Sys. Co., 125 F.3d 1371, 1373 (11th Cir. 1997), abrogated

on other grounds by Gray v. Lockheed Aeronautical Sys. Co., 155 F.3d 1343 (11th

Cir. 1998).  "Stripped to its essentials, the military contractor defense is available

only when the defendant demonstrates with respect to its design and manufacturing

decisions that the government made me do it."  Gray, 125 F.3d at 1377.

On appeal, Brinson argues that RAC has not presented sufficient evidence to

establish, as a matter of law, that the first two prongs of the Boyle test are

satisfied.[2]  We note that Brinson has not argued that RAC failed to prove the third

prong.  Accordingly, we address the first two prongs in turn.

A.  Approval of reasonably precise specifications

---

[2]     RAC argues that Brinson's brief relies on evidence which is both inadmissible and was not properly before the district court on summary judgment.  We need not and do not address this issue.  We have reviewed all the evidence submitted to this Court by the parties.  None of the evidence in dispute affects our resolution of the merits of this appeal.

7

"This condition requires the existence of two factors: reasonably precise specifications and government approval of them." Gray, 125 F.3d at 1377. It is meant to ensure that a government officer considered and approved "the design feature in question." Boyle, 487 U.S. at 512, 108 S. Ct. at 2518. Here, the design feature in question is the rudder trim system, including specifically the TAD.

"Where the government merely approves imprecise or general guidelines, the contractor retains the discretion over the important design decision and enjoys no immunity against liability based on the Boyle defense." Gray, 125 F.3d at 1377. "[M]ilitary hardware does not suddenly spring into being from initial design and procurement specifications, but evolves through drawings, blueprints and mockups agreed upon by the parties." Id. at 1378 (quoting Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 702 (4th Cir. 1989)). "The ultimate design of the product is determined not only by the original procurement and contract specifications, but also by specific, quantitative engineering analysis developed during the actual production process." Id.

Two of our prior precedents illustrate these boundaries. In Gray, the Navy contracted with Lockheed to develop a new antisubmarine warfare aircraft. Id. at 1374. The Navy worked closely with Lockheed to develop many aspects of the aircraft and participated in a series of design reviews. Id. Nonetheless, Lockheed

8

failed to carry its burden on summary judgment under the military contractor defense. The design feature in question was the aircraft's aileron servo.[3] Id. Rather than producing copies of engineering drawings, Lockheed submitted a document containing a narrative description of the general requirements the servo was designed to meet. Id. at 1378. This Court held that general narrative requirements can not rise to the level of "reasonably precise specifications." Id.

By contrast, in Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir. 1989), the defendant successfully carried its burden on summary judgment under the military contractor defense. The USAF contracted with General Dynamics to produce the military's first "fly-by-wire" fighter, operated completely by electric controls. Id. at 1313. Following a fatal crash, plaintiffs theorized that the aircraft suffered from a massive electrical failure caused by "'wire chafing' – the rubbing of wires in the electrical system against other wires, fasteners, or structural parts of the plane." Id. at 1314. General Dynamics presented evidence that a group of USAF engineers was specifically assigned to review the design of the aircraft's electrical system including specifications,

---

[3] "Part of the S-3's flight control system, the servo is contained in the S-3's fuselage and it links the pilot with the ailerons. An aileron is a movable part of an airplane wing or a movable airfoil external to the wing at the trailing edge for imparting a rolling motion and thus providing lateral control." Gray, 125 F.3d at 1374 (internal citations omitted).

9

drawings and blueprints.  Id. at 1320.  The USAF and General Dynamics engaged

in "continuous back and forth" discussions during the review and approval process.

Id.  This evidence properly supported application of the military contractor defense

at summary judgment.

However, despite the guidance these cases provide, our inquiry cannot end

here.  The instant case presents an issue of first impression in our Circuit.  In

January of 2004, the USAF issued a TCTO requiring inspection and replacement of

the T-6A's rudder trim pushrods.  As a threshold matter, we must determine

whether RAC may rely on this post-design, post-production evidence as additional

evidence to satisfy the first prong of the Boyle test.  We join several of our sister

circuits in concluding that it may.

First, we will return to the Supreme Court's decision in Boyle to re-examine

the rationale behind the development of the military contractor defense.  The Boyle

test is designed to identify those situations where there is a "significant conflict

between federal interests and state law in the context of Government procurement."

Boyle, 487 U.S. at 511, 108 S. Ct. at 2518.  To outline those situations presenting a

"significant conflict," the Court relied on § 2680(a) of the Federal Tort Claims Act

("FTCA").

In the FTCA, Congress authorized damages to be recovered against

the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred. 28 U.S.C. § 1346(b). It excepted from this consent to suit, however, "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Boyle, 487 U.S. at 511, 108 S. Ct. at 2518. The Court went on to reason:

We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.

Boyle, 487 U.S. at 511-12, 108 S. Ct. at 2518. In light of this rationale, we conclude that post-design, post-production evidence may fit within the Boyle rationale. When faced with a potentially failing or defective part, the military may make a discretionary decision concerning how to address the problem. We do not want to "second-guess" that judgment through a state law tort suit. Just as in the original design process, defense contractors may "predictably raise their prices to

11

cover, or to insure against" the possibility that the government will dictate how to address a potential defect.

Review of cases outside this Circuit supports this conclusion. The Fourth Circuit addressed this issue first. In Dowd v. Textron, Inc., 792 F.2d 409, 410 (4th Cir. 1986),[4] the Army contracted with the defendant, Bell, to design a helicopter. Subsequently, during a flight at a Naval pilot school, the rotor system on one of the Bell helicopters struck and severed its mast causing a fatal crash. Id. This phenomenon is known as "mast bumping." Id. The plaintiff alleged that the rotor system was defectively designed. Bell moved for summary judgment on the basis of the military contractor defense. Id. Bell presented evidence that the Army had investigated the problem of mast bumping several years after the rotor system was originally designed. Id. at 410-11. Bell and the Army exchanged information on the design of the rotor system and Bell proposed three design modifications aimed at preventing mast bumping. Id. at 411. The Army rejected Bell's proposals. Id. The Fourth Circuit concluded that "the Army's experience with the 540 rotor system

---

[4]     Dowd was decided before the Supreme Court issued its decision in Boyle in 1989. However, the Fourth Circuit's decision was reaffirmed in Ramey v. Martin-Baker Aircraft Co., 874 F.2d 946, 950 (4th Cir. 1989) ("There are two routes by which Martin-Baker may satisfy the first prong of the Boyle test. In Dowd, we indicated that even though the military had not developed or approved the specifications for the component at issue, '[t]he length and breadth of the [military's] experience with the [component] – and its decision to continue using it – amply establish government approval of the alleged design defects.' 792 F.2d at 412.").

– and its decision to continue using it – amply establish government approval of the alleged design defects." Id. at 412.

Then, in 1993, the Second Circuit, citing and discussing Dowd, reached the same conclusion. See Lewis v. Babcock Indus., Inc., 985 F.2d 83, 87-89 (2d Cir. 1993). In Lewis, the military contracted with General Dynamics to design its F-111 jet fighter. Id. at 84. After General Dynamics delivered the F-111 to the military, the USAF became aware of corrosion on certain cables produced by Babcock Industries. Id. at 85. The USAF completed an investigation of the problem and decided to reorder new Babcock cables to replace the existing ones. Id. Subsequently, the plaintiff suffered spinal injuries when one of the Babcock cables connecting the parachute system to his crew ejection module severed. Id. at 84. The Second Circuit held that "when the Government reordered the specific Babcock cable, with knowledge of its alleged design defect, the Government approved reasonably precise specifications for that product such that the manufacturer qualifies for the military contractor defense for any defects in the design of that product." Id. at 89. The court noted that if liability were imposed the contractor might

> seek to raise the price of the replacement cables to cover its anticipated liability from the damage that might be caused by their failure. Such reaction would frustrate the policy underlying the FTCA's

13

discretionary function exception by placing the cost of the Government's discretionary decisions on the Government itself when it contracts for a product.

Id.

In sum, we join the Second and Fourth Circuits in concluding that post-design evidence is relevant under the Boyle analysis.[5] Whether or not the evidence in this case represents meaningful acceptance of the rudder trim system and specifically the TAD is a question we will explore in greater depth below.

We now apply the foregoing principles to the facts of this case. For the reasons that follow, we conclude that RAC has presented sufficient evidence to establish, as a matter of law, that the USAF approved reasonably precise specifications of the rudder trim system, including the TAD in particular. First, throughout 1998 and 1999, USAF engineers signed off on documents demonstrating that they reviewed drawings of T-6A components, including the rudder trim system. RAC's undisputed statement of material facts asserts that these documents verify "that the government approved and accepted the [TAD] as meeting the Contractual

_____

[5]     See also Kerstetter v. Pacific Scientific Co., 210 F.3d 431, 434, 438 (5th Cir. 2000) (apparently also considering as relevant evidence the fact that the Navy continued to order and use a potentially defective "crotch strap" notwithstanding the Navy's knowledge of and previous evaluation of potential deficiencies).

14

requirements."[6] Second, RAC presented evidence that, in February of 2000, engineers representing the USAF reviewed engineering drawings and work instructions for the T-6A rudder assembly, of which the TAD is a component. RAC's undisputed statement of material facts states that this review was conducted to ensure that the "as-built" configuration of the aircraft complied with the requirements in the design documentation; it also affirmatively states that the government reviewed RAC's design drawings to ensure that the aircraft complied with those requirements. The cited report states that government representatives "reviewed many engineering documents as a normal course of doing business while performing contractor surveillance," and notes that "[v]irtually all assembly

_____

[6] This crucial statement of material fact (as well as the others) is of course deemed admitted. See supra note 1. Moreover, there is substantial evidence supporting the fact that the government always had the design drawings and approved the design drawings of the several systems, including the TAD. See, e.g., Larison Aff. ¶ 28 ("The government always had access to drawings of the TAD and all other systems . . . . [A]ll design changes . . . were approved by the government, regardless of whether they were initially conceived by the government or by RAC."); id. ¶ 22 ("The government was fully involved with the productionization design of the TAD . . . [and] had the final say over the design's suitability . . . ."); id. ¶ 5 n.1, ¶ 20 (Productionization means that the TAD system was not fully designed or fully qualified, but necessary adjustments to the design had to be made with close government involvement in order to fully qualify the design for government requirements); Hybl Aff. ¶ 7 ("The Trim Aid Device ("TAD"), which is at issue in this lawsuit, was unique to the T-6A and instrumental to RAC's bid because it allowed the aircraft to fly like a jet and yet maintain the fuel efficiency of a propeller driven aircraft. The government participated in numerous meetings with RAC concerning the TAD . . . commented on its design . . . [and the] TAD was subjected to close governmental involvement even before the contract was awarded."); id. ¶ 26 ("[T]he government had its 'fingerprints' on every aspect of the T-6A, including the TAD system, approving the design, testing procedures and results, production and certification of each part and system of the T-6A.").

drawings have been reviewed," inter alia, "through day to day operations."[7] Finally, the TCTO demonstrates that, as of January of 2004, the military was specifically aware of the design defect at issue – i.e. that some of the rudder trim pushrods showed evidence of bending. With this knowledge, the government issued a specific order mandating the remedy it deemed appropriate with respect to the known defect – i.e. the TCTO ordered that the pushrods be replaced with new but identical Teflon-lined pushrods.

Appellant responds to this evidence, in part, by accurately noting that "approval must be meaningful, not a mere formality." Gray, 125 F.3d at 1377. A defendant cannot prevail on summary judgment simply by showing that a government representative signed a design drawing or ordered a replacement part. Cf. Gray, 125 F.3d at 1379 ("The fact that the Navy . . . actually replaced the servo in the crashed S-3 does not prove that the servo conformed to precise, Navy-approved specifications"); see also Trevino v. Gen. Dynamics Corp., 865 F.2d 1474, 1477, 1486-87 (5th Cir. 1989) (concluding that the signatures of military representatives on seventy-one detailed drawings of a Navy diving chamber were not sufficient to satisfy the first prong of the military contractor defense if the

_____

[7] We also note that the TAD is one of the critical components of the T-6A. The military selected RAC's cost-efficient, single propeller proposal in part because design features such as the TAD allowed the T-6A to emulate jet flight.

approval was nothing more than a rubber stamp).

The first prong of the <u>Boyle</u> test is designed to ensure that "the design feature in question was <u>considered</u> by a Government officer." <u>Boyle</u>, 487 U.S. at 512, 108 S. Ct. at 2518 (emphasis added). Here, that criterion is met. There is ample undisputed evidence of a "continuous back and forth" between RAC and governmental representatives during the development of the T-6A, involving review and approval of design drawings of all systems, including the TAD.[8] <u>Harduvel</u>, 878 F.2d at 1320. Evidence of exhaustive communication between a contractor and the

---

[8] RAC's undisputed statement of material facts demonstrates the extensive level of interaction between RAC and the military. "RAC and the government operated on an 'open kimono' basis, meaning that RAC and the government discussed all problems and issues . . . as soon as these issues came up." Specifically, RAC and USAF personnel interacted regularly during daily status meetings, weekly conferences, monthly technical reviews and quarterly program reviews. The technical reviews included government representatives from the Systems Program Office, "an autonomous group tasked with making decisions regarding potential trade-offs between safety and efficiency requirements of Air Force Aircraft." "Engineers and others in parallel professional disciplines from both RAC and the government worked closely together to design, analyze, test, and improve the producibility of the T-6A."

RAC also expressly addressed the rudder trim system and TAD. "The government participated in numerous meetings with RAC concerning the TAD . . . prior to award of the Contract." "The government remained intimately involved in the T-6[A] program after award of the Contract, when RAC and the government entered the manufacturing and development phase of the project." The Procurement Contract required RAC and USAF engineers to work together as part of an "integrated product development" team. The integrated team concept "required direct, hands on participation by both RAC and government representatives." Clifton Larison was the integrated products team leader for the mechanical, electrical and avionics sub-systems on the T-6A. His USAF counterpart was civilian engineer Bob Fitzharris. Fitzharris was involved in the "installation and interfacing" of the TAD into the T-6A. He ensured that the T-6A trim system was properly certified by FAA standards and actively participated with RAC to resolve problems. Larison estimated that he spoke with his government counterparts "an average of two or three times per day throughout the certification process."

military is a persuasive indication that the military's approval, if given, was meaningful. Id. Accordingly, on the facts before us, RAC has established that the military's review of rudder trim system drawings, including the TAD, was meaningful. Furthermore, in light of both the military's considered review of engineering drawings and its extensive involvement ("continuous back and forth") in the development and production of the T-6A, RAC has presented sufficient evidence from which we may conclude that the military's January 2004 TCTO (ordering immediate replacement of new but identical pushrods) reflects an informed, discretionary decision on how to address a known problem.[9] Accordingly, considering these three categories of evidence together, we conclude that RAC has carried its burden on summary judgment to show that the government approved reasonably precise specifications of the rudder trim system and its critical component – the TAD.

RAC having properly supported its summary judgment and established as a matter of law that the government approved reasonably precise specifications,

---

[9] In considering the TCTO, along with the other evidence that the government reviewed and approved reasonably precise specifications with respect to the TAD, we note that the TCTO represents more than the mere unadorned fact of the government's continued use in the face of knowledge of the potential design defect. Rather, the TCTO represents a formal order of the relevant government agency mandating specific action to remedy a known problem. Accordingly, we need not express an opinion with respect to the significance of mere continued use in the face of such knowledge. See Lewis, 985 F.2d at 89 n.3.

Brinson must set out specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e)(2). Brinson has failed to do so. On appeal, Brinson asserts: (1) RAC independently designed the TAD; (2) the USAF did not sign off on the TAD's source control drawings before they were sent to the subcontractor for production; and (3) the Teflon-lined rod was an "off the shelf part." We could accept arguendo the first two factual assertions in Brinson's favor; however, neither raises a genuine issue for trial. Under the Boyle test, it is enough that the military meaningfully approved reasonably precise drawings of the TAD at some point during the design and production process. The third argument we find unpersuasive. Although the TAD was originally designed and patented by RAC, we have seen that RAC produced evidence that the design was considered, reviewed and approved by the government in an extensive and "continuous back and forth" process. Government engineers approved the inclusion of the pushrod into a unique and critical component of a complex piece of equipment. See In re "Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 90 (2d Cir. 2007) ("All products can eventually be broken down into various off-the-shelf components." (quoting Miller v. Diamond Shamrock Co., 275 F.3d 414, 420 (5th Cir. 2001))).

We believe that this case is very similar to our prior decision in Harduvel. In both cases, government representatives reviewed and approved the design feature at

issue, including drawings, as part of a "continuous back and forth" process. Indeed, in the instant case, we have the additional evidence (in the January 2004 TCTO) that the government was aware of the specific design defect at issue and mandated appropriate remedial action. With respect to this first Boyle factor, the instant case is readily distinguished from Gray. There, the military contractor could prove only that the Navy had approved a general narrative description. Gray, 125 F.3d at 378. By contrast, in the instant case, RAC has proved that the government meaningfully reviewed and approved reasonably precise specifications – i.e. the actual drawings for the TAD.

In summary, RAC has sufficiently established that the military approved reasonably precise specifications of the rudder trim system, including the TAD. None of Brinson's arguments raise a genuine issue of fact material to this conclusion. Accordingly, we conclude that RAC has satisfied the first prong of the Boyle test on summary judgment.

B. Conformity to Reasonably Precise Specifications

"To demonstrate the second Boyle condition, a contractor must show that the equipment at issue conformed to precise, government-approved specifications." Gray, 125 F.3d at 1378. We conclude that RAC has carried its burden on summary judgment. RAC presented evidence that engineers representing the government

reviewed drawings to ensure that the "as-built" configuration of the T-6A complied with its design documentation. Furthermore, RAC attached a DD Form 250 to its motion for summary judgment. The DD Form 250 is a "Material Inspection and Receiving Report." It is signed by a government representative and states that the specific aircraft piloted by Captain Brinson on April 3, 2004 was accepted by the military and conformed to the contract. See Miller v. Diamond Shamrock Co., 275 F.3d 414, 420 (5th Cir. 2001) ("[T]he government's issuance of a DD Form 250, Material Inspection and Receiving Report, further establishes the item's conformity."). Finally, "where the procurement process involves [a] continuous exchange between the contractor and the government, the process itself becomes persuasive evidence of the product conformity to precise specifications." Gray, 125 F.3d at 1378 (internal citations omitted). We have already established that RAC presented ample evidence of a "continuous exchange" with the military. See supra note 8.

Accordingly, RAC has properly supported its motion for summary judgment and established that the equipment at issue conformed to government-approved specifications. Thus, Brinson must to point to specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(e)(2).

Brinson argues that the TAD did not meet all of the Airworthiness Standards

21

for Acrobatic Category Airplanes contained in title 14, part 23 of the Code of

Federal Regulations.[10]  This argument in Brinson's initial brief is far too sparse and

vague to warrant our review; the argument points to no lack of conformity with the

reasonably precise specifications that the government approved.  Moreover,

Brinson's argument misperceives our inquiry.  At this stage, we ask only if the

rudder trim system, and the TAD in particular, conformed to the military's

reasonably precise specifications.[11]  Brinson points to no facts suggesting that the

---

[10]     Brinson also asserts that the T-6A was not properly tested or FAA certified
because RAC personnel (as opposed to FAA or military representatives) were responsible for
testing and inspecting the TAD.  However, RAC's undisputed statement of material facts asserts:
(1) "RAC submitted a Quality Test Procedure to the government which was a proposal to test the
TAD and a rationale for how the proposed test would demonstrate that the TAD complied with
the government's specifications and requirements for the system; the government reviewed and
approved the Quality Test Procedure; the testing was then performed on the TAD; a Quality Test
Report was prepared and presented to the government; and the government reviewed and
approved the test results in a document called a Compliance Report;"  (2) "A government
engineer monitored the rudder and trim tab tests on the T-6[A] and had designated office space at
RAC for years;" and (3) "Contract compliance officers representing the government were on site
at RAC each and every day during design and certification of the aircraft.  Government
representatives continue to be on site to this day, monitoring production and acceptance test
procedures."  Accordingly, Brinson fails to raise a genuine issue of fact as to the second prong of
the Boyle test.

[11]     The Fourth Circuit in Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 702-
03 (4th Cir. 1989), rejected a similar argument.  There, the plaintiff relied on general
requirements that aircraft landing gear be strong enough to withstand normal landing loads.  Id.
at 702.  The Fourth Circuit held that these general requirements were used to develop detailed
structural load parameters and detailed design drawings, which the Navy approved.  Id.  The
Fourth Circuit held: "These working drawings, and not simply the general qualitative
specifications from the procurement stage, comprise 'the reasonably precise specifications'
contemplated by [the second Boyle factor]."  Id.  Kleemann explains:
       In essence, plaintiffs' argument is that the ultimate design of the landing gear
       failed to produce an aircraft that performed perfectly.  Plaintiffs' view would
       render the government contractor defense illusory.  Nonconformance to precise

TAD or any other component of the rudder trim system was not built exactly as it was designed. We have already concluded that the military approved that design. Accordingly, we conclude, as a matter of law, that RAC has met the second prong of the <u>Boyle</u> test.[12]

## IV. CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of RAC on the military contractor defense.

AFFIRMED.

---

specifications must mean more than that the design does not work in compliance with some "general admonition against an unwanted condition." <u>Harduvel</u>, 878 F.2d at 1319 n.3. A product involved in a design-induced accident would, as a definitional matter, always be deemed not to comply with such generalities since no performance specifications approved by the government would purposely allow a design that would result in an accident.

<u>Id.</u> at 703.

[12] Again, with respect to the second <u>Boyle</u> factor, <u>Gray</u> is readily distinguished. In <u>Gray</u>, the second <u>Boyle</u> factor was not satisfied because the product at issue did not conform to the specifications – e.g., the latch did not conform to its specified dimension of 0.3750 plus or minus 0.0001, and the shut-off valve triggered at 1400 psi instead of the specified 800 psi. As noted, Brinson in this case points to no such nonconformity with the precise specifications.