[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15412
_____

D.C. Docket No. 4:12-cv-00220-HLM


LEE ROY SWAFFORD,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(October 27, 2016)

Before ROSENBAUM and JILL PRYOR, Circuit Judges, and UNGARO,[*] District
Judge.

ROSENBAUM, Circuit Judge:

_____

[*] Honorable Ursula Ungaro, United States District Judge for the Southern District of
Florida, sitting by designation.

This appeal requires us to consider the scope of the United States's liability under federal and state law for injuries suffered by a plaintiff who fell down a set of stairs within a federally owned recreation area. The district court granted summary judgment in favor of the Government, finding that the United States was insulated from liability under both the discretionary-function exception to the Federal Tort Claims Act and the limited-liability provisions of Georgia's Recreational Property Act. While we reverse the district court's application of the discretionary-function exception, we ultimately affirm the judgment because Georgia law precludes recovery against the Government under the circumstances of this case.

## I.

### A.

The relevant undisputed facts are as follows. On September 18, 2010, Plaintiff-Appellant Lee Roy Swafford and his wife traveled to the R. Shaefer Heard Campground ("Campground"), near West Point, Georgia. The United States Army Corps of Engineers ("the Corps") owns the campground, which is situated on the shores of West Point Lake and is encompassed within the scope of the Corps's broader West Point Lake Project in Georgia and Alabama.

2

A few days into his stay, Swafford woke before dawn and, after it was light out, took his dog for a walk. Swafford walked from Campsite 23, where he was staying, towards Campsite 26 because he wanted to see the view of the lake from that campsite. At Campsite 26, with dog leash and cup of coffee in hand, Swafford descended the site's wooden stairway. In the process, Swafford fell and injured himself.

Before arriving at the Campground, Swafford reserved his campsite online, paying $132 in fees for six nights of camping ($22 per night). By statute, the Corps is prohibited from charging "entrance or admission fees" to its recreational areas. 16 U.S.C. § 460d-3(a). Instead, the fee charged in Swafford's case was for use of the Campground's overnight camping facilities, which included a recreational-vehicle parking pad with electrical, water, and sewage services. The Corps sets the campsite fee based on the electrical amperage available at each site and charges the fee on a per-vehicle, rather than a per-person, basis.

Persons who are not staying overnight may visit campers at the Campground, but they must pay a daily "user fee" to do so. No general, day-use access to the Campground is available to the public; only campers and campers' visitors may enter. So it is undisputed that no one can access the Campground without paying some type of fee. But beyond the campsite fees and visitor fees, the Corps does not levy any other fees for recreational activities at the

3

Campground. The Corps uses the fees it collects to defray some of the costs of services it provides at the Campground.

Since December 1, 2005, the Corps has contracted with the Anderson Construction Company ("Anderson") to provide "all 'maintenance, repair, and operations of facilities, vehicles, and equipment" at West Point Lake, including the Campground. The contract provides for Anderson's "complete inspection, maintenance, and repair" of all campsites and stairways "necessary to keep them in safe working condition." Under the contract, "[w]ork . . . shall be performed under the general direction of the Authorized Representative of the Contracting Officer (ARCO)," and all work must comply with "applicable laws, regulations, codes, or directives."

**B.**

In January 2012, Swafford filed a claim with the General Services Administration and received notification in June 2012 that investigation of his claim was complete and that he would receive a decision shortly. When Swafford did not receive a decision letter, he filed a complaint in federal court on September 19, 2012. Swafford amended his complaint on November 4, 2013.

Relying on the Federal Tort Claims Act ("FTCA"), Swafford's amended pleading alleges three counts against the United States. The first asserts a claim of premises liability under O.C.G.A. § 51-3-1, alleging that the United States, as

4

owner of the property where Swafford was injured, "negligently and carelessly caused, allowed, and/or permitted a hazardous condition to exist and remain as to the steps at Campsite 26." The second count, relying on O.C.G.A. § 51-2-5(5), asserts that "any negligence on the part of Anderson in also failing to inspect, maintain, and repair the steps at Campsite 26" is imputable to the United States because the Corps exercised control over Anderson in a master-servant relationship. The final count, citing O.C.G.A. § 51-2-5(6), contends that the United States is liable because it "ratified Anderson's negligent failure to inspect and/or repair the steps at Campsite 26 on the Defendant's premises by not requiring the repair of the defective and hazardous steps."

The district court ultimately granted summary judgment in the Government's favor. With respect to Count I, the district court concluded that Georgia's Recreational Property Act ("RPA"), O.C.G.A. §§ 51-3-20 to -26, limited the liability of the United States as landowner because the Government had made the Campground available for recreational use free of charge. In the district court's view, the campsite and visitor fees charged by the Corps were not charges for admission to the Campground.

On Count III, the district court held that the decisions of the Corps or Anderson either not to inspect or not to repair the stairs at Campsite 26 fell within the discretionary-function exception to the FTCA. As a result, the district court

determined, the United States could not be held liable for those decisions.  So the district court granted the Government summary judgment on that claim.

With respect to Count II, though, the district court initially denied summary judgment.  While recognizing that the FTCA precludes liability for the actions of the Government's independent contractors, the district court concluded that material disputes of fact existed over the extent of the Corps's control of Anderson's activities and whether Anderson was properly characterized as an independent contractor.  The court set the case for trial on Count II.  As trial approached, however, the district court reconsidered its position, concluding that Georgia's RPA also precluded finding the United States liable under the *respondeat superior* theory of Count II.  As a result, the district court granted summary judgment to the Government on Swafford's last pending claim.  This appeal followed.

## II.

We review a district court's grant of summary judgment *de novo*.  *Brinson v. Raytheon Co.*, 571 F.3d 1348, 1350 (11th Cir. 2009).  Summary judgment is warranted if the record demonstrates "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Brinson*, 571 F.3d at 1350-51.

6

### III.

Although the district court considered the discretionary-function exception last, and only with respect to Count III of Swafford's complaint, we recognize that whether the FTCA applies in Swafford's case is a question that implicates our subject-matter jurisdiction. *See JBP Acquisitions, LP v. United States ex rel. FDIC*, 224 F.3d 1260, 1263-64 (11th Cir. 2000). If the exception were to apply to Swafford's claims, we would lack jurisdiction over this action. *See id.* But we conclude that Swafford's claims lie outside the discretionary-function exception, so we reverse that part of the district court's order holding otherwise.

### A.

The FTCA grants federal district courts exclusive jurisdiction over claims for damages against the United States arising from personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). Specifically, "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

But the FTCA exempts from liability torts resulting from "discretionary functions":

> The provisions of this chapter and section 1346(b) of this
> title shall not apply to—

7

> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S. Ct. 2755, 2762 (1984). This exception must be strictly construed in favor of the Government, and if it applies, federal courts lack subject-matter jurisdiction over the claims. *See U.S. Aviation Underwriters, Inc. v. United States*, 562 F.3d 1297, 1299 (11th Cir. 2009); *JBP Acquisitions*, 224 F.3d at 1263.

In evaluating whether the discretionary-function exception applies, we first "must determine exactly what conduct is at issue." *Autery v. United States*, 992 F.2d 1523, 1527 (11th Cir. 1993).  Courts then apply the two-step test developed by the Supreme Court in *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 108 S. Ct. 1954 (1988), and *United States v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267 (1991).  *See U.S. Aviation Underwriters*, 562 F.3d at 1299.

8

First, we consider whether the challenged conduct "is a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536, 108 S. Ct. at 1958. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Id.* Challenged conduct is not discretionary "when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Id.* at 536, 108 S. Ct. at 1958-59. Here, Swafford has submitted no evidence that a federal statute, regulation, or policy specifically requires the inspection, maintenance, and repair of the stairs at Campsite 26. As a result, on this record, we must conclude that deciding whether to engage in these tasks involves an element of judgment or choice.

If the conduct involves an element of judgment and is discretionary, the court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 536, 108 S. Ct. at 1959. As the Supreme Court has explained, the exception is designed to prevent "judicial second guessing" of decisions "grounded in social, economic, and political policy." *Id.* at 536-37, 108 S. Ct. at 1959 (quoting *Varig Airlines*, 467 U.S. at 814, 104 S. Ct. at 2764-65). Accordingly, the discretionary-function exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, 108 S. Ct. at 1959; *see also Gaubert*, 499 U.S. at 323, 111 S. Ct. at 1274.

9

In *Gaubert*, the Supreme Court further elaborated on the discretionary-function exception by linking the two parts of the test with a presumption: "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." 499 U.S. at 324, 111 S. Ct. at 1274. But importantly, the Court observed that some otherwise-discretionary acts are "obviously" outside the scope of the discretionary-function exception, citing the example of negligently driving an automobile on official business. *Id.* at 325 n.7, 111 S. Ct. at 1275 n.7 For example, the Court explained, "[a]lthough driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy." So "[t]he discretionary function exception applies only to conduct that involves the *permissible exercise of policy judgment*." *See Berkovitz*, 486 U.S. at 539, 108 S. Ct. at 1960 (emphasis added).

## B.

In urging us to find the discretionary-function exception inapplicable, Swafford points us to the Supreme Court's decision in *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S. Ct. 122 (1955). In *Indian Towing*, a barge company sued the United States for damages when its vessel ran aground, alleging negligence by the Coast Guard in failing to maintain a lighthouse. *Id.* at 62, 76 S. Ct. at 123. In

10

that case, the government conceded that the facts of the case would not fit within discretionary-function exception but instead argued that the FTCA did not apply to "uniquely governmental functions." *See id.* at 64-69, 76 S. Ct. at 124-27; *see also Gaubert*, 499 U.S. at 326, 111 S. Ct. at 1275.

The Supreme Court disagreed. In holding that the United States could be liable, the Supreme Court relied on "hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Indian Towing*, 350 U.S. at 64-65, 76 S. Ct. at 124. So even though the Coast Guard was under no obligation to construct a lighthouse, once the Coast Guard "exercised its discretion to operate [the lighthouse] and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order," including monitoring its function and repairing it or at least warning if it were not functioning. *Id.* at 69, 76 S. Ct. at 126-27. In the same vein, we conclude that the Corps's decision to build and "operate" a staircase on the Campground gives rise to a similar obligation to inspect and maintain that staircase in a safe condition.

In *Berkovitz* and *Gaubert*, the Supreme Court reconciled its discretionary-function holdings with the *Indian Towing* decision. Specifically, in *Berkovitz*, the Supreme Court observed that *Indian Towing* "illuminates the appropriate scope of

11

the discretionary function exception" by explaining that while "the initial decision to undertake and maintain lighthouse service was a discretionary judgment," failure to maintain the lighthouse in good, working condition "did not involve any permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 538 n.3, 108 S. Ct. at 1959 n.3.

Similarly, in *Gaubert*, the Supreme Court clarified that "[t]he United States was held liable [in *Indian Towing*], not because the negligence occurred at the operational level but because making sure the light was operational 'did not involve any permissible exercise of policy judgment.'" *Gaubert*, 499 U.S. at 326, 111 S. Ct. at 1275 (quoting *Berkovitz*, 486 U.S. at 538 n.3, 108 S. Ct. at 1959 n.3.) Indeed, *Gaubert* reiterates that the Government did not seek to claim the benefit of the discretionary-function exception in *Indian Towing*—a decision that in all probability reflects the Government's recognition that negligent maintenance of the lighthouse is not the type of permissible policy decision the exception is designed to protect. *See id.*; *see also Indian Towing*, 350 U.S. at 64, 76 S. Ct. at 124.

We recognize that decisions of this Court have spoken negatively of the *Indian Towing* decision post-*Gaubert*. *See, e.g.*, *Cranford v. United States*, 466 F.3d 955, 959 (11th Cir. 2006); *Monzon v. United States*, 253 F.3d 567, 572-73 (11th Cir. 2001); *Ochran v. United States*, 117 F.3d 495, 505-06 (11th Cir. 1997). But the criticism of *Indian Towing* in those decisions centers on plaintiffs' attempts

12

to use *Indian Towing* to support a dichotomy between "discretionary functions" and "operational functions" under the FTCA—a distinction the Supreme Court expressly disavowed in *Gaubert*. *See Gaubert*, 499 U.S. at 325-26, 111 S. Ct. at 1275-76. Swafford's argument here, though, is not that maintaining the stairs is an "operational" function instead of a "discretionary" one. Rather, Swafford argues that, like the lighthouse, once the Corps exercised its discretion to build *and* maintain the stairs, failure to maintain them in a safe condition is simply not a permissible exercise of policy judgment. We agree.

## C.

The Government also attempts to distinguish *Indian Towing* by framing the relevant conduct as the Corps's "acceptance or non-acceptance of Anderson's work," a type of conduct, it argues, that is regularly protected by the exception. But the Government's argument misses the mark. The Government is correct that, generally, decisions about accepting a contractor's work or decisions about how to supervise a contractor *can* be discretionary decisions, particularly when a contract does not specify how the Government must supervise the contractor. *See Andrews v. United States*, 121 F.3d 1430, 1440-41 (11th Cir. 1997). But here, unlike in *Andrews*, the Corps's contract with Anderson specifically required Anderson to inspect, maintain, and repair the Campground's stairways as "necessary to keep them in safe working condition." Whatever range of choice the Corps may have

13

had in supervising Anderson, "choosing" to "accept" a dangerously unsafe stairway is simply not a permissible exercise of discretion any more than is choosing to not maintain a lighthouse, *Indian Towing*, 350 U.S. at 69, 76 S. Ct. at 126-27, or choosing to drive carelessly on official business, *Gaubert*, 499 U.S. at 325 n.7, 111 S. Ct. at 1275 n.7.

In sum, we conclude that the discretionary-function exception to the FTCA does not bar Swafford's claims. Of course, a factual dispute remains over whether the stairs at Campsite 26 were dangerously unsafe. And, as the district court concluded, another factual dispute exists over whether Anderson is an independent contractor.[1] Ultimately, though, these disputes will remain unresolved because we conclude that Georgia's RPA precludes recovery for the negligence Swafford alleges led to the injuries he suffered at the Campground.

## IV.

Swafford contends on appeal that the district court further erred in finding the Corps insulated from liability under Georgia's Recreational Property Act ("RPA"), O.C.G.A. §§ 51-3-20 to -26. Specifically, Swafford asserts that because no person can access the Campground without paying some type of fee, those fees are essentially "admission charges" for entering the Campground. If true, those

---

[1] If that's the case, the United States may be able to avoid liability for any negligence on Anderson's part. *See* 28 U.S.C. § 2671; *Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir. 1995).

14

admission charges would defeat the statute's limitation on liability.  Our review of Georgia law, however, leads us to a different conclusion under the circumstances presented in this case.[2]

## A.

Georgia's RPA limits the liability of landowners in order to encourage them to open up their properties for recreational use free of charge.  Specifically, the statute provides,

> Except as specifically recognized by or provided in Code Section 51-3-25, an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes or to give any warning of a dangerous condition, use, structure, or activity on the premises to persons entering for recreational purposes.

O.C.G.A. § 51-3-22.  As described by the legislature, the purpose of the RPA "is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting the owners' liability toward persons entering thereon for recreational purposes."  O.C.G.A. § 51-3-20.

Two statutory exceptions to this limitation on liability exist.  One applies if the landowner willfully or maliciously fails "to guard or warn against a dangerous

---

[2] Although the district court applied the RPA to just the first two counts of Swafford's complaint, we discern no reason why the RPA would not apply to all three.  After all, the RPA protects the *landowner* from liability.  O.C.G.A. § 51-3-22.  Regardless of which theory of negligence Swafford advances, the United States is the landowner he is seeking to hold liable.  And, of course, we may affirm a district court's judgment on any reason supported by the record, irrespective of whether the district court relied on that reason.  *See Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1283 (11th Cir. 2012).

condition, use, structure, or activity." O.C.G.A. § 51-3-25. This exception is not relevant to this case, as Swafford makes no allegations of willful or malicious conduct by the Corps or Anderson.

The second exception removes the RPA's protection from liability "[f]or injury suffered in any case when the owner of land charges the person or persons who enter or go on the land for the recreational use thereof." O.C.G.A. § 51-3-25(2). The statute defines "charge" as "the admission price or fee asked in return for invitation or permission to enter or go upon the land." O.C.G.A. § 51-3-21(1). The statute non-exhaustively defines "recreational purpose" to include "hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, aviation activities, nature study, water skiing, winter sports, and viewing or enjoying historical, archeological, scenic, or scientific sites." O.C.G.A. § 51-3-21(4).

Georgia's courts have interpreted the RPA broadly in order to effectuate its purpose of encouraging land owners to open their properties for recreational use. And while the Georgia courts have several times considered fees charged by landowners, we have not located a single case where a Georgia court concluded that any fee qualified as a charge for admission to the property within the meaning of O.C.G.A. § 51-3-25(2).

In apparently the first case to consider the RPA, the Georgia Supreme Court held that a $1.00-per-car parking fee did not qualify as a charge for admission to

16

the park. *Stone Mountain Mem'l Ass'n v. Herrington*, 171 S.E.2d 521, 523 (Ga. 1969). Although the court offered sparse discussion of the issue, it found that the parking fee was charged per car, not per occupant of the car. The court explained that, in its view, the fee was "purely a parking or driving permit for automobiles, and was in no way related to the admission of persons to the park." *Id.* Other Georgia courts have similarly found that parking or automobile fees are distinguishable from admission fees under the RPA. *See, e.g.*, *Lowry v. Cochran*, 699 S.E.2d 325, 330 (Ga. Ct. App. 2010); *Majeske v. Jekyll Island State Park Auth.*, 433 S.E.2d 304, 305-06 (Ga. Ct. App. 1993).

Still other cases have likewise concluded that when fees relate to other services or permits, those fees are not "admission" charges within the meaning of the statute. For example, in *Lee v. Department of Natural Resources*, 588 S.E.2d 260 (Ga. Ct. App. 2003), the plaintiffs traveled to Ossabaw Island, Georgia, to go hunting. *Id.* at 262. Georgia law requires hunters to obtain "wildlife management area licenses" to hunt in various wildlife areas around the state. *Id.* at 262-63. Although the plaintiffs could not enter the island (or other wildlife areas in the state) to hunt without paying the fee to obtain a Georgia wildlife management area license, the court noted that access to the island for "recreational purposes is free to members of the general public, as are permits to hunt on the island, subject to having valid hunting and wildlife management area licenses." *Id.* at 262. So the

17

court held that the fees paid were for those licenses and "not for entry upon Ossabaw Island for recreational purpose." *Id.* at 262-63.

In *Hogue v. Stone Mountain Memorial Ass'n*, 358 S.E.2d 852 (Ga. Ct. App. 1987), a family was charged a $4 fee when entering the park, "in return for which they received a vehicle sticker which permitted them to exit and re-enter the park without additional charge during their stay there." *Id.* at 854. The per-vehicle sticker fee also did not depend on the number of occupants in the car. *Id.* Additionally, during the family's stay, they paid a camping registration fee and purchased food, souvenirs, and attraction tickets. *Id.* Relying on *Herrington*, the Georgia court concluded that the vehicle fee was for permission to use the vehicle in the park and not "a charge for the recreational use of the parkland itself." *Id.* Similarly, the court concluded that the camping fee and other purchases were not "charges for the recreational use of the parkland itself, it appearing that such general activities as swimming and sightseeing were available to and engaged in by the family without charge." *Id.*

Likewise, Georgia courts have found that when fees are used to defray certain costs, those fees are not admission charges. For example, in *South Gwinnett Athletic Ass'n, Inc. v. Nash*, 469 S.E.2d 276 (Ga. Ct. App. 1996), a little-league baseball player was injured climbing on a wall while watching his brother's T-ball game. *Id.* at 276-77. The boy's family argued that the league registration

18

fees constituted admission charges within the meaning of the RPA. *Id.* at 277. But the court concluded that this fee was not an admission charge, finding persuasive, among other things, that the fee was charged to cover league expenses such as uniforms, umpires, lights, water, and sanitation. *Id.*; *see also Gayle v. Frank Callen Boys & Girls Club, Inc.*, 745 S.E.2d 695, 697-98 (Ga. Ct. App. 2013) (fees used, among other things, to "defray some of the operating costs for recreational activities").

## B.

With these cases in mind and on this record, we conclude that the fees charged by the Corps at the Campground, which are assessed to defray the costs of providing electricity and other utilities, do not constitute admission fees charged for permission to enter Campground for recreational use. It is undisputed here that the Corps uses the campsite and visitor fees it collects to defray some of the costs of services it provides at the Campground. *See Gayle*, 745 S.E.2d at 697-98; *Nash*, 469 S.E.2d at 277. It charges the variable campsite fee based on the amperage available at individual campsites and does not charge for any recreational activities at the Campground. *See Lee*, 588 S.E.2d at 262-63; *Hogue*, 358 S.E.2d at 854. And the Corps charges the fee on a per-vehicle basis—and not per-person— suggesting the fee is "in no way related to the admission of persons to the park." *See Herrington*, 171 S.E.2d at 523.

19

We also note that federal law expressly prohibits the Corps from charging an entrance fee for admission to its public recreation areas.  16 U.S.C. § 460d-3(a).  But federal law does allow the Corps to charge for use of "developed recreation sites and facilities," as well as to assess fees "for the use of specialized sites, facilities, equipment or services related to outdoor recreation furnished at Federal expense."  16 U.S.C. § 460d-3(b)(1); 36 C.F.R. § 327.23(a).  The fees charged by the Corps at the Campground are authorized by these latter provisions and are compatible with Georgia law.  Indeed, the distinction in federal law between admission fees and use fees emphasizes the view of Georgia courts that an admission fee can be, and is, distinguishable from service or facilities fees.

We acknowledge that, in determining that the RPA does not apply, some Georgia cases have also recognized as important the ability to access the land free of any charge.  *See, e.g.*, *Herrington*, 171 S.E.2d at 523; *Nash*, 469 S.E.2d at 277; *Lowry*, 699 S.E.2d at 330; *Majeske*, 433 S.E.2d at 305-06.  But other cases have not considered the fees' impact on access.  *See, e.g.*, *Quick v. Stone Mountain Mem'l Ass'n*, 420 S.E.2d 36, 38 (Ga. Ct. App. 1992); *Hogue*, 358 S.E.2d at 854.  Every Georgia case we have reviewed, though, has emphasized to some extent the use or purpose of the fee in determining whether the RPA applies.  Under the circumstances of this case—where federal law prohibits the Corps from charging an admission fee and it is undisputed that the purpose of the fee is to defray the

costs of utilities and services provided to campers and their guests—we have little difficulty concluding that the fee charged here is not a charge for admission.[3]

## V.

In sum, we conclude that the district court erred in applying the discretionary-function exception of the FTCA to Swafford's claims. Accordingly, we reverse that part of the district court's order. But we find that the district court correctly determined that the fees charged by the Corps are not admission charges within the meaning of the RPA. For this reason, we affirm the district court's application of Georgia's RPA to Swafford's case.

**AFFIRMED.**

---

[3] We also acknowledge the possibility that a nefariously creative landowner could attempt to disguise his admission fee as nothing more than a service fee. But those are not the facts and circumstances presented in this case.